JUDGE SPRIZZO

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK



'08 CIV 4452

Civil Action No._____

| | |
|---|---|
| NEIL FALLON, JEAN-PAUL GASTER, DAN MAINES and RICHARD SULT, individually and collectively p/k/a CLUTCH | ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| DRT ENTERTAINMENT, INC., and DEREK SCHULMAN | ) ) ) |
| Defendants. | ) ) ) |

**COMPLAINT**

RECEIVED
MAY 13 2008
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiffs Neil Fallon, Jean-Paul Gaster, Dan Maines and Richard Sult, individually and collectively performing as the musical group "Clutch," by and for their Complaint against Defendants DRT Entertainment, Inc. and Derek Schulman, state and allege as follows:

## THE PARTIES

1. Plaintiff Neil Fallon ("**Fallon**") is an individual residing in Montgomery County, Maryland. Fallon is the vocalist and guitarist of the musical group "Clutch."

2. Plaintiff Jean-Paul Gaster ("**Gaster**") is an individual residing in Frederick County, Maryland. Gaster is the drummer of the musical group "Clutch."

3. Plaintiff Dan Maines ("**Maines**") is an individual residing in Montgomery County, Maryland. Maines is the bass guitarist for the musical group "Clutch."

4. Plaintiff Richard Sult ("**Sult**") is an individual residing in Morgan County, West Virginia. Sult is the lead guitarist of the musical group "Clutch" (Fallon, Gaster, Maines and Sult are hereinafter referred to as "**Plaintiffs**" or "**Clutch**".)

5.      Defendant DRT Entertainment, Inc. (hereinafter "**Defendant**" or "**DRT**") is a New York City based independent record label founded in 2003 by Derek Shulman, Ron Urban and Theodore Green.  DRT is a New York corporation with its principal offices located at 511 West 33rd Street, 4th Floor, New York, New York 10001.  DRT is currently signed to a U.S. Distribution Deal with Universal Music Group's Fontana Distribution.  DRT is also distributed by Universal Music Canada and a variety of companies in the rest of the world, including Pinnacle in the United Kingdom.  DRT is liable for all acts complained of herein.

6.      Defendant Derek Schulman ("**Schulman**") is an individual residing in New York County, New York.  Upon information and belief, Schulman was and remains, at all times material herein, the president, CEO and controlling shareholder of DRT and is liable for all acts complained of herein.

## JURISDICTION AND VENUE

7.      This is an action for damages, injunctive relief and declaratory relief arising out of a license agreement between Plaintiffs and Defendant DRT dated October 23, 2003, a true and correct copy of which is attached as Exhibit "A" (the "**License Agreement**").

8.      This Court has original subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §1331 and 1338 because this action arises under the U.S. Copyright Act (17 U.S.C. §101 et. set.) and the Lanham Act (15 U.S.C. §1051).  This Court has supplemental jurisdiction as to the remaining claims under 28 U.S.C. §1367.

9.      This Court also has original subject matter jurisdiction under 28 U.S.C. §1332 because the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

10.    This court has personal jurisdiction over Defendants because DRT is a New York corporation, has its principal place of business in New York City, Schulman is the President of DRT and resides in New York County, and DRT is signatory to the License Agreement, which provides in pertinent part, as follows:

> "This Agreement is governed by and construed in accordance with the laws of the State of New York, without regard to choice of law provisions. DRT and [Clutch] agree that any action relating thereto, connected with or arising out of this Agreement, shall be brought in the state or federal courts located in New York County, and the parties to this Agreement hereby submit to the jurisdiction and venue of such courts."

11.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a), (b) and (c).

### ALLEGATIONS RELEVANT TO ALL COUNTS

12.    On or about October 23, 2003, Clutch entered into the License Agreement with DRT. Under the License Agreement Clutch licensed to DRT the exclusive right to distribute up to three new Clutch albums. Clutch also transferred to DRT, during the Term of the License Agreement, a 50% ownership interest in the copyright of each master sound recording (the "**Masters**") delivered by Clutch under the License Agreement. Clutch did not grant DRT any ownership interest in the underlying musical compositions embodied on the Masters.

13.    Under subparagraph 2(e) of the License Agreement, Clutch has the right, at any time following the end of the Term, to a reversion of DRT's fifty percent (50%) ownership interest in the copyright of the Masters. "Term" is defined as the period commencing on the date of the License Agreement and terminating on the date which is twenty-five (25) years following the "Outside Date," which is defined as the date which is nine (9) months following the Delivery of the last master recordings to be delivered to DRT under the License Agreement.

14.    Under paragraph 6 of the License Agreement, DRT agreed to pay to Clutch an advance of $100,000.00 in connection with delivery of the first album.  In the event DRT elected to exercise it options to the second and third albums, DRT agreed to pay to Clutch advances ranging from $60,000.00 to $200,000.00 per album according to a formula based upon the prior album's sales under subparagraph 6(b).

15.    The advances due Clutch under paragraph 6 were "recoupable" solely out of sound recording royalties accruing to Clutch on sales of records containing the Masters. Royalties accruing from other third-party licensing exploitations of the Masters (i.e., synchronization license, coupling licenses, and similar uses) are not applied toward recoupment of contractual advances provided in Subparagraph 6(a) or 6(b), but could be applied toward recoupment of discretionary advances (i.e. for deficit tour support).  See License Agreement, ¶¶s 4(c), 6(d)(ii-iv)).

16.    Under subparagraph 6(d) of the License Agreement, DRT agreed to pay to Clutch a royalty equal to 50% of DRT's "Net Receipts," which is defined as "gross receipts actually received by DRT or credited to DRT from its Distributor and licensees prior to deduction of all distribution fees and other costs charged by Distributor (i.e., no costs shall be deducted from gross receipts prior to computing Net Receipts)," but minus a "combined distribution and overhead services fee" and direct out-of-pocket costs paid by DRT in connection with the Masters.

17.    Under paragraph 7 of the License Agreement, DRT agreed to obtain mechanical licenses and pay mechanical royalties at the full statutory rate on all musical compositions embodied on the masters delivered by Clutch, including musical compositions that were written by, and owned or controlled by, the members of Clutch (the "**Controlled Compositions**").  The

4

total amount of mechanical royalties due on Compositions, including Controlled Compositions, is capped at ten (10) songs per album, two (2) songs per single, five (5) songs per EP and three (3) songs for any other record manufactured and sold.

18.     Mechanical royalties accruing to Clutch on Controlled Compositions are <u>not</u> applied toward recoupment of advances paid under subparagraphs 6(a) and 6(b) or discretionary advances under subparagraphs 4(c) or 6(d).  Rather, DRT agreed to pay mechanical royalties from the manufacture and sale of the first record even if DRT had not yet recouped advances from sound recording royalties accruing to Clutch.

19.     Under paragraph 6 of the License Agreement, DRT has the right to retain a reserve against anticipated returns and credits.  However, DRT must liquidate such reserves in four equal quarterly installments commencing with the first accounting one year after such reserve was initially established.

20.     Under paragraph 8 of the License Agreement, DRT agreed to provide quarterly accountings setting forth in detail the computation of royalties accruing to Clutch, together with payment of amounts due.

21.     Under paragraph 9 of the License Agreement, Clutch has the right to inspect, audit and object to the quarterly accountings to be provided by DRT under paragraphs 6 and 8 of the License Agreement.

22.     Clutch fully satisfied all "Delivery Requirements" under paragraphs 1 and 5 and otherwise performed all of its obligations under the License Agreement, including, without limitation, the delivery by Clutch and acceptance by DRT of three full albums, as follows: (a) "Blast Tyrant" (released by DRT on March 30, 2004; (b) "Robot Hive/Exodus" (released by DRT on June 21, 2005); (c) "From Beale Street to Oblivion" (released by DRT on March 20,

2007).  Clutch also made mechanical licenses available under paragraph 7 for all Controlled Compositions embodied on Clutch albums delivered under the License Agreement through Clutch's exclusive publishing administrator, Integrated Copyright Group, Inc. ("**ICG**").

23.    Despite its obligation to provide quarterly accounting statements, DRT failed to deliver many of the quarterly mechanical royalty and record royalty statements due under the License Agreement.  Of the few statements provided, none were timely delivered and none were quarterly statements.  For example, one statement purported to report over two years of accountings, one purported to report two quarters, and one purported to report three quarters.

24.    Clutch has reserved all rights under the License Agreement, including, without limitation, the right to inspect and audit the books of DRT and to object to the royalty statements delivered by DRT to date.

25.    The last accounting statement DRT provided to Clutch purports to be a universal accounting of all Clutch releases distributed by DRT, and is entitled "Clutch – US & International – COMBINED – Inception through September 30, 2007" (the "**9/30/07 DRT Statement**").

26.    The 9/30/07 DRT Statement failed to report per unit sales of Clutch releases. Rather, it reported a gross sales figure of $3,248,296.88 for Clutch albums released by DRT from inception through September 30, 2007.  DRT deducted from this gross sales figure "Returns Actual" of $320,242.88.  DRT also deducted "Reserves" (against anticipated returns) of $803,265.34, thereby deducting a total returns figure (actual and anticipated) of $1,123,508.20.  DRT reported "Liquidating Reserves" of only $469,439.12.  As a result, under DRT's own accountings (to which Clutch reserves objections), DRT has retained as a reserve against anticipated returns after September 30, 2007 of $654,069.10, even though actual returns

before September 30, 2007 (over three years of accountings) amounted to only $320,242.88. Despite repeated demands, DRT failed and refused to liquidate reported reserves under paragraph 6 of the License Agreement.

27.    The 9/30/07 DRT Statement reported mechanical royalties of $201,843.57 due Clutch as of September 30, 2007.  However, to date DRT has paid only the sum of $49,058.87 in mechanical royalties, leaving an unpaid balance of at least $152,784.70 according to DRT's own accountings through September 30, 2007 (to which Clutch reserves objections).

28.    There are numerous discrepancies in the statements delivered by DRT through September 30, 2007 and the actual sales figures reported by data tracking services. According to Nielson SoundScan ("**SoundScan**"), the data tracking services for sales of music products throughout the United States and Canada, DRT distributed and sold at least 220,288 units of Clutch albums as of June 30, 2007.  However, ICG reports that DRT had paid mechanical royalties on sales of only 71,953 albums, leaving at least 148,335 albums for which no mechanical royalties have been paid as of June 30, 2007.

29.    Despite its obligation to do so, DRT has provided no other accounting statements since the 9/30/07 DRT Statement.  However, DRT continues to sell and distribute Clutch albums.  According to SoundScan, DRT distributed and sold at least 267,853 units of Clutch albums through the week ending April 13, 2008.  Therefore, DRT has failed to pay mechanical royalties on the sale of at least 195,900 Clutch albums through April 13, 2008.

30.    DRT committed numerous other breaches of the License Agreement, including, without limitation: (a) failing to secure international distribution of the Clutch albums; (b) failing to obtain approvals for the marketing budget; and  (c) failing to obtain approvals of packaging, release dates and liner notes.

31.    DRT has sold and distributed Clutch merchandise, posters and other promotional materials containing Clutch trademarks without any license or authority to do so and has retained all monies collected from such unauthorized sales.

32.    Beginning in March 2007, Clutch provided DRT with numerous written notices of DRT's material breaches pursuant to paragraph 14 of the License Agreement. Since that time, DRT has failed and refused to cure its material breaches and continues to sell Clutch albums without providing royalty statements and payments as required under the License Agreement.

33.    On November 9, 2007, Clutch provided DRT with written notice of termination of the License Agreement and reversion of all rights granted by Clutch to DRT. To date DRT has ignored Clutch's demand and continues to sell Clutch albums without providing royalty statements and payments and despite a reversion of sound recording copyrights to Clutch and termination of mechanical licenses under the License Agreement.

34.    On March 21 and April 30, 2008, ICG provided DRT with written notice of DRT's failure to pay mechanical royalties due on sales of Clutch albums and of the termination of mechanical licenses granted in connection with the Controlled Compositions. DRT has failed and refused to make payment of mechanical royalties on sales of Clutch to date, and continues to sell Clutch albums without providing royalty statements and payments to Clutch and after termination of mechanical licenses to the Controlled Compositions.

## **COUNT ONE**
### (Copyright Infringement)

35.    Plaintiffs reallege and incorporate paragraphs 1 through 34 of the Complaint herein.

36.    This Count arises out of the occurrences as set forth hereinabove and hereinafter and is directly related to the counts for copyright infringement under 17 U.S.C. §5101, et seq.

37.     Plaintiffs are the owners of all right, title and interest in the copyright in and to the Controlled Compositions licensed to DRT, including, without limitation, the registered copyrights of Controlled Compositions identified on Certificate of Copyright Registration Nos. PA 1594952, PA 1594968, PA 1594963, PA 1594967, PA 1594956 and PA 1594964 and pending registrations wherein registration numbers have not yet been assigned.

38.     Plaintiffs have duly performed all terms and conditions of the License Agreement required to be performed by Plaintiffs, including, without limitation, providing DRT with written notices of DRT's default and failure to pay mechanical royalties, and the termination of mechanical licenses following DRT's failure to cure the default.

39.     DRT has knowingly and willfully violated Plaintiff's copyrights by continuing to copy, sell, license, distribute and/or market Clutch albums embodying Clutch's Controlled Compositions without license or authority to do so.

40.     By reason of Defendants' infringement and continued threatened infringement after termination of mechanical licenses, Plaintiffs have sustained and will continue to sustain substantial injury, loss and damages to their ownership rights in the Controlled Compositions.

41.     Defendants have been copying, selling, licensing, distributing and otherwise marketing the Controlled Compositions and have thereby been engaging in unfair trade practices and unfair competition against Plaintiffs causing Plaintiffs irreparable injury.

## COUNT TWO
(Copyright Infringement)

42.     Plaintiffs reallege and incorporate paragraphs 1 through 41 of the Complaint herein.

43.     This Count arises out of the occurrences as set forth hereinabove and hereinafter and is directly related to the counts for copyright infringement under 17 U.S.C. §1501, et seq.

44.     Plaintiffs have duly performed all terms and conditions of the License Agreement required to be performed by Plaintiffs, including, without limitation, providing DRT with written notices of DRT's default, failure to account and pay royalties, and the termination of the License Agreement and reversion of the sound recording copyrights in the Masters to Clutch.

45.     By reason of DRT's material breach of the License Agreement, all rights in and to the Masters have reverted to Plaintiffs.  Therefore, Plaintiffs are the owners of all right, title and interest in the copyrights in the sound recordings on Clutch albums licensed by DRT.

46.     DRT has knowingly and willfully violated Plaintiffs' copyrights by continuing to copy, sell, license, distribute, and/or market Clutch albums containing Clutch's sound recordings without license or authority to do so.

47.     By reason of Defendants' infringement and continued threatened infringement after termination of the License Agreement, Plaintiffs have sustained and will continue to sustain substantial injury, loss and damages to their ownership rights in the copyrighted sound recordings.

## **COUNT THREE**
(Breach of Contract)

48.     Plaintiffs reallege and incorporate paragraphs 1 through 47 of the Complaint herein.

49.     After the date of execution of the License Agreement, and from time to time, DRT has breached the License Agreement by failing to account to Plaintiffs pursuant to Paragraphs 6 and 8 (Exhibit A)  of the License Agreement, although such accounting has been duly demanded.

50.     After the date of the License Agreement, and from time to time, DRT has breached the License Agreement by failing to pay Clutch a significant portion of amounts

reported on the accounting statements as due and owing Clutch, although such payments have been duly demanded, and failing or refusing to provide a full accounting and all statements required under the License Agreement and payment of all royalties related thereto.

51.     After the date of the License Agreement, and from time to time, DRT has committed numerous other breaches of the License Agreement, including, without limitation: (a) failing to secure international distribution of the Clutch albums; (b) failing to obtain approvals for the marketing budget; (c) failure to obtain approvals of packaging, release dates and liner notes.

52.     Plaintiffs have duly performed all terms and conditions of the License Agreement required to be performed by Plaintiffs.

53.     As a direct  result of DRT's breach of the License Agreement, Plaintiffs have suffered damages in an undetermined sum at this time but believed to be in excess of $250,000.00.

### COUNT FOUR
(Unfair Competition and Trademark Infringement)

54.     Plaintiffs reallege and incorporate Paragraphs 1 through 53 of the Complaint herein.

55.     This Count arises under the Trademark Laws of the United States, 15 U.S.C. § 1051 *et seq.*

56.     Plaintiffs did not permit DRT to copy, sell, license or distribute their images, names, or trademarks for profit.  Upon information and belief,  DRT sold and distributed Clutch posters, merchandise and other promotional materials, utilizing the images and names of the Plaintiffs and the Clutch trademarks.

57.    DRT's use and exploitation of Clutch's trademarks was done without authorization and constitutes an infringement of Clutch's trademark rights.

58.    The sale and distribution of goods by Defendants utilizing Plaintiffs' trademarks, images and names is likely to cause confusion and mistake and deceive the public as to the source of origin of the goods.   Defendant's use of the work is calculated to deceive the public into believing that such good is provided or sponsored by the Plaintiffs.

59.    Plaintiffs have no adequate remedy at law, have suffered irreparable harm and damage as a result of Defendants' palming off, and is suffering monetary damages in an amount not thus far determined.

## COUNT FIVE
(State Unfair Competition)

60.    Plaintiffs reallege and incorporate Paragraphs 1 through 59 of the Complaint herein.

61.    This Count arises under the Trademark Laws of the State of New York and, more particularly, New York General Business Law, §§360 *et seq.* and arises out of the same occurrences and transactions set forth hereinabove.

62.    Plaintiffs did not permit DRT to copy, sell, license or distribute their images, names, or trademarks for profit.  Upon information and belief, DRT sold and distributed Clutch posters, merchandise and other promotional materials, utilizing the images and names of the Plaintiffs and the Clutch trademarks.

63.    DRT's use and exploitation of Clutch's trademarks was done without authorization and constitutes an infringement of Clutch's trademark rights.

64.    The sale and distribution of goods by Defendants utilizing Plaintiffs' trademarks, images and names is likely to cause confusion and mistake and deceive the public as to the

source of origin of the goods.   Defendant's use of the work is calculated to deceive the public into believing that such good is provided or sponsored by the Plaintiffs.

65.    Plaintiffs have no adequate remedy at law,  have suffered irreparable harm and damage as a result of Defendants' palming off, and is suffering monetary damages in an amount not thus far determined.

## COUNT SIX
(Violation of Right of Publicity)

66.    Plaintiffs reallege and incorporate Paragraphs 1 through 65 of the Complaint herein.

67.    This Count arises under the Civil Rights Law §50 - 51 of New York State and arises out of the same occurrences and transactions set forth hereinabove.

68.    Defendants' sale of Clutch posters, merchandise and other goods, incorporating Plaintiffs' identities, names, portraits and/or pictures without Plaintiffs' consent and for commercial purposes, is a violation of Plaintiffs' right of publicity.

69.    Plaintiffs have no adequate remedy at law,  have suffered irreparable harm and damage as a result of Defendants' wrongful conduct, and is suffering monetary damages in an amount not thus far determined.

## COUNT SEVEN
(For an Accounting)

70.    Plaintiffs reallege and incorporate Paragraphs 1 through 69 of the Complaint herein.

71.    Upon information and belief, from 2004 to the present, DRT  collected all income derived from the sale, distribution and licensing of master recordings delivered by Clutch pursuant to the License Agreement.   Upon information and belief, DRT has also collected

income derived from the sale of Clutch merchandise without authorization from or payment to Clutch.

72.    Prior to commencement of this action, Plaintiffs duly demanded a full accounting of all income received by DRT and payable to Plaintiffs, including, without limitation, liquidation of the reserves, payment of mechanical royalties, and payment of income derived from the sale of Clutch merchandise.  To date, DRT has failed or refused to provide, a full accounting and has failed and refused to pay amounts owed under the License Agreement.

73.    Plaintiffs have suffered damages in an undetermined sum at this time but believed to be in excess of $250,000.00.

## COUNT EIGHT
(Declaration of Termination of License Agreement)

74.    Plaintiffs reallege and incorporate Paragraphs 1 through 73 of the Complaint herein.

75.    Plaintiffs have duly performed all terms and conditions of the License Agreement required to be performed by Plaintiffs,  including, without limitation, providing DRT with written notices of DRT's material breaches pursuant to paragraph 14 of the License Agreement.

76.    Since that time, DRT has failed and refused to cure its material breaches and continues to sell Clutch albums without providing royalty statements and payments as required under the License Agreement.

77.    Plaintiffs have no adequate remedy at law,  have suffered irreparable harm and damage as a result of Defendants' wrongful conduct, and is suffering monetary damages in an amount not thus far determined.

## COUNT NINE
(Conversion)

78.    Plaintiffs reallege and incorporate Paragraphs 1 through 77 of the Complaint herein.

79.    This Count is directly related to the counts for copyright infringement under 17 U.S.C. §§ 101, et seq. and breach of contract.

80.    Upon information and belief, Defendants fraudulently copied, sold, licensed and distributed the sound recordings and controlled composition s which are owned by Plaintiffs.

81.    Due to these fraudulent actions, Defendants received income, a sum of money the full amount of has not been determined, which is the property of Plaintiffs.

82.    Defendants converted the money collected for their own use.

83.    Plaintiffs have been damaged in an amount not yet determined.

**WHEREFORE**, Plaintiffs demand judgment against Defendant DRT Entertainment, Inc. as follows:

1.    That Defendants, their agents and servants, employees, attorneys, and those acting in concert with Defendants, be enjoined during the pendency of this action and permanently from infringing the Controlled Compositions and sound recordings of Plaintiffs herein in any manner, and from making, selling, marketing, or otherwise disposing of any copies of Plaintiffs' Controlled Compositions and sound recordings.

2.    That Defendants, their agents and servants, employees, attorneys, and those acting in concert with Defendants, be enjoined during the pendency of this action and permanently from using Plaintiffs' images, names, or likenesses in any manner whatsoever, and manner, and from making, selling, marketing, or otherwise disposing of merchandise depicting Plaintiffs' images, names or likenesses.

3. That Defendants be required to account to Plaintiffs for all gains, profits, and advantages derived from Defendants' wrongful acts and to provide Plaintiffs with a full and complete accounting of all income received by Defendants associated with the License Agreement and any other income received by Defendants, including but not limited to income derived from the unauthorized sale and improper distribution of Clutch merchandise.

4. For a declaration that the License Agreement is terminated and enjoining DRT from distributing Clutch records or collecting any income derived therefrom, and declaring that any interest that DRT has in the copyright of the master recordings delivered by Clutch under the License Agreement have reverted to the members of Clutch.

5. With respect to the copyright infringements alleged in Counts 1 and 2 that Plaintiffs recover from Defendants in lieu of actual damages, should Plaintiffs so elect, statutory damages as provided by 17 U.S.C. §504(c);

6. With respect to the acts alleged in Counts 3 - 9, that Plaintiffs recover from Defendants, the money damages sustained by Plaintiffs as a result of Defendants' wrongful acts;

7. That Defendants be directed to deliver up to Plaintiffs all Masters, copies of Masters, CDs, tapes, records, or merchandising goods (e.g., posters, stickers, etc.) in possession or under Defendants' control, which, if sold, distributed, or used in any way would violate ¶¶1-2 hereof;

8. That Defendants be directed to deliver up to Plaintiffs all copies of the Controlled Compositions, Masters and merchandise in Defendants' possession or under Defendants' control, which, if sold, distributed, or used in any way would violate ¶¶1-2 hereof;

9. That Plaintiffs recover from Defendants reasonable counsel fees together with the costs of this action;

10.    That Plaintiffs have such other and further relief as to the Court may seem just and proper.

Dated: _May 9, 2008_

ATTORNEYS FOR PLAINTIFFS
FURGANG & ADWAR, L.L.P

By: _____
Stephanie Furgang Adwar  SA-1711
1325 Avenue of the Americas, 28' Floor
New York, NY  10019
(212) 725-1818


Of Counsel
LOMMEN, ABDO, COLE, KING &
STAGEBERG, P.A.
Timothy C. Matson, Esq.
Minn. Atty. I.D. No. 225423
2000 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 339-8131

This agreement (the "Agreement") is made as of the 23rd day of October, 2003, by and between DRT ENTERTAINMENT, INC., a New York corporation with offices located at 45 West 21st Street, 4th Floor, New York, N.Y. 10010 ("DRT") –and- NEIL FALLON, JEAN-PAUL GASTER, DAN MAINES AND RICHARD SULT, jointly and severally p/k/a "Clutch" ("Artist"), c/o Greenberg, Traurig, LLP, Met Life Building, 200 Park Avenue, New York, N.Y. 10166 ("Artist").

The parties hereby agree as follows:

1. (a) (i) Artist hereby licenses exclusively to DRT during the Term of this Agreement and in the Territory the Master Recordings comprising the next Album embodying Artist's performances (the "First Album"), including all rights, title and interest which Artist may have in the musical and other performances embodied therein, but excluding copyright in and to the underlying musical compositions. Without limitation, it is understood and agreed that DRT shall have the sole and exclusive right and license during the Term and within the Territory with respect such Album for all purposes, including without limitation the right to manufacture, advertise, promote, sell and otherwise exploit Phonograph Records. Artist shall deliver the Existing Masters and associated Delivery Requirements (as set forth in Paragraph 5 below) to DRT within four (4) months following full execution of this Agreement.

(ii) Artist agrees to, and hereby does, transfer to DRT a fifty percent (50%) undivided ownership interest in and to the copyright in and to each Master Recording hereunder concurrently with delivery of such Master Recording. Such copyright ownership shall be retained by DRT for the Term. Artist agrees to execute and deliver to DRT all documents necessary or desirable to evidence such co-ownership of copyright promptly following DRT's written request therefor.

(b) (i) Artist hereby grants to DRT two (2) separate, irrevocable options (the "Second Album Option" and the "Third Album Option", respectively) to acquire the exclusive license rights in and to the Master Recordings comprising the two (2) long-playing albums next following the First Album (the "Second Album Masters" and the "Third Album Masters", respectively) embodying the studio performances of on the same terms and conditions applicable to the First Album, except as set forth to the contrary herein. Each such Option shall be exercised by DRT in writing, if at all, by written notice to Artist sent not later than the date which is eight (8) months following the initial commercial release in the United States by DRT of the immediately preceding Album hereunder, and the applicable Album for which such Option is exercised shall be delivered not later than four (4) months following the date of Artist's receipt of DRT's written notice of DRT's exercise of the applicable Option. Solely for purposes of the preceding sentence, each Album released hereunder shall be deemed to have been released in the United States by DRT on the earlier of (i) the date which is nine (9) months following the date of

1



delivery of the First Album and associated Delivery Requirements or (ii) the actual date of initial commercial release of such Album in the United States.

(ii)    Nothing contained herein shall obligate DRT to permit Artist to record any Album for which an Option is exercised, it being understood that Company's sole obligation to Artist as to each unrecorded Album for which an Option is exercised shall be to pay to Artist an amount equal to the greater of (A) the Advance for the unrecorded Album less the actual recording costs incurred in connection with Artist's prior Album or (B) one-half of the Advance for the unrecorded Album.  Artist shall, at DRT's request, furnish DRT with documentation reasonably satisfactory to DRT evidencing the costs incurred in connection with such prior Album.

2.    For the purposes of this Agreement the following definitions shall apply:

(a)    "Master Recordings" shall mean the original sound recordings or combinations of recordings on any substance or material, whether now known or unknown, set forth on Schedule "A", a copy of which is attached hereto and made a part hereof.  Artist shall not re-record or authorize the re-recording of any Master Recording subject to this Agreement during the Term.  Artist shall not release, or permit the release of, any sound recordings embodying Artist's performances prior to the date which is seven (7) months following the later of (i) the initial commercial release of the last Master Recordings delivered to DRT hereunder (solely for purposes of this subparagraph 2(a) the date of such initial commercial release shall be deemed to be the earlier of (A) the date of actual release or (B) six (6) months (excluding the months of November and December) following the date of Delivery of such Master Recordings) or (ii) the date which is nine (9) months following Delivery of the last Master Recordings Delivered to DRT hereunder (the "Outside Date").  Artist and Artist shall at all times have the right to record Artist's performances for use in motion pictures so long as such recorded performances are not commercially released (other than as part of the motion picture in its entirety, or in connection with the advertising and promotion of such motion picture) prior to the Outside Date.

(b)    "Phonograph Records" or "Records" and/or their equivalent shall mean and include all conventional types of compact discs, audio tape and phonograph records now in use as well as any and all other products and devices, now known or hereafter developed, by which sound and/or visual images may be recorded for later transmission to listeners whether in the immediate presence of a recording instrument or device or via radio, digital download, television or other medium, and embodying sound alone or sound in synchronization with visual images (so called "audio-visual devices").

(c)    "Territory" shall mean the universe.  DRT agrees (i) to release each Album hereunder in the United States within one hundred twenty (120) days following delivery of the master recordings comprising such Album and all associated Delivery Requirements, (ii) to release each Album hereunder in Canada within thirty (30) days following the initial commercial release of such Album in the United States and (iii) to release each Album hereunder in the territories of the United Kingdom, Ireland, Germany, Austria, Switzerland, Japan, Australia and

2

New Zealand within sixty (60) days following the initial commercial release of each such Album in the United States. The months of November and December shall be excluded in the computation of the preceding periods. If DRT fails to release any Album as provided herein, then, notwithstanding anything to the contrary contained in this Agreement, Artist shall have the right to give DRT written notice of such failure within ninety (90) days following the end of the applicable period, and, if DRT does not cure such failure within ninety (90) days following the date of receipt of Artist's notice (excluding the months of November and December), Artist shall have the right to license the applicable Album to a third party distributor in the relevant territory. In the event that any such Album is released by a third party distributor, Artist shall cause such third party distributor to account directly to DRT and pay to DRT forty percent (40%) of all monies which would otherwise accrue to Artist's account as a result of such exploitation directly to DRT, and DRT shall be entitled to retain such monies for DRT's own account.

(d)    "Distributor" shall mean Navarre Corporation. If Navarre Corporation ceases to be DRT's distributor during the Term, and DRT enters into an agreement with another distributing Artist, the new distributing Artist shall be substituted for Navarre Corporation as "Distributor" hereunder. If DRT is without national distribution services (i.e., distribution services comparable to or better than those currently provided by Navarre) for a period in excess of sixty (60) consecutive days during the Term, Artist shall have the right to terminate the Term of this Agreement by written notice sent to DRT at any time following the end of such sixty (60) day period. DRT shall have sixty (60) days following DRT's receipt of Artist's notice (the "Cure Period") to cure (or to notify Artist in writing if DRT has secured national distribution services prior to the date of DRT's receipt of Artist's notice) and, if DRT fails to secure national distribution services by the end of the Cure Period, such termination shall be effective on the first day following the expiration of the Cure Period.

(e)    (i)    "Term" shall mean the period commencing on the date of this Agreement and terminating on the date which is twenty-five (25) years following the following the Outside Date (as defined in subparagraph 2(a) above). Artist shall have the right, at any time following the end of the Term, to send notice of copyright reversion to DRT and copyright ownership in all master recordings Delivered hereunder shall revert to Artist on the tenth business day following DRT's receipt of such notice of copyright reversion from Artist. DRT agrees to execute and deliver to Artist all documents reasonably necessary or desirable to evidence such reversion, including without limitation written assignments of copyright in a form suitable for filing with the U.S. Copyright Office. Following the expiration of the Term, DRT shall have a further non-exclusive sell-off period of six (6) months in which to sell off Records manufactured during the Term but remaining unsold at the date of expiry of the Term. DRT agrees that DRT shall not manufacture excess quantities of Records in anticipation of the end of the Term. Upon termination of the Term, Artist will promptly instruct DRT as to how to dispose of excess inventory. If Artist requests return of such inventory, such return shall be at Artist's sole cost and expense, and the returned inventory shall be "star burned" or otherwise permanently marked prior to being sent to Artist to prevent the return of such inventory to DRT or Distributor. If Artist has not given DRT instructions as to how to dispose of such excess inventory by the date thirty (30)

3

days following the end of the Term, DRT shall have the right, in DRT's sole discretion, to dispose of all or part of such excess inventory in any manner it deems appropriate. All Master Recordings supplied by Artist hereunder, as well as all matrixes, mothers, stampers, and other copies or derivatives shall be promptly returned to Artist upon the termi of on of the Term of this Agreement.

(ii)    For purposes of clarity, it is understood and agreed that "Term" as defined in subparagraph 2(e)(i) above applies to the term of DRT's exploitation rights with respect to Master Recordings hereunder, and not to the period during which DRT is entitled to Artist's exclusive recording services hereunder. The term during which DRT is entitled to Artist's exclusive recording services hereunder is the period commencing as of the date of this Agreement and terminating on the date of Delivery of the last Master Recordings Delivered hereunder, subject to the limitations on release of sound recordings embodying Artist's performances prior to the Outside Date as detailed in subparagraph 2(a) above.

(f)    "Statutory Rate" shall mean the U.S. or Canadian statutory royalty, as appropriate, applicable to a composition of under five minutes' duration pursuant to U.S. or Canadian copyright law as of the earlier of (i) the date of delivery of the applicable Master Recording hereunder or (ii) the last date on which such Master Recording could have been timely delivered.

(g)    "Album" shall mean a sufficient number of Master Recordings embodying Artist's studio performances of original musical compositions which have not been previously recorded, whether by Artist or by any other party to comprise one (1) or more long-playing compact disc(s) of not less than forty (40) minutes' playing time and containing at least ten (10) different musical compositions. Each Album shall be of substantially the same style and quality as previously Delivered Albums embodying Artist's performances

3.    The exclusive rights hereby granted by Artist to DRT for the Territory during the Term include, but are not limited to, the following:

(a)    The right to manufacture, sell, advertise, promote and otherwise exploit Phonograph Records produced from the Master Recordings, and allow others to do so, in each manner and in any and all fields of use, upon such terms and conditions as DRT shall desire or may agree and under the trade marks and labels of DRT and Artist, or other such trade marks, labels, names or other identification as DRT shall desire or agree and by any means or method whether now or hereafter known, invented, used or contemplated, including without limitation digital download and Internet-related means of distribution and exploitation.

(b)    The right of utilization of the Master Recordings (with or without words) for the making of commercials and cinematic works or for any other kind of fixation of sounds in connection with images, as well as any other combination of works whether musical (with or without words) with other kinds of works for interactive use, on multimedia and/or other data carriers or in databases, documentation systems or similar types of storage media, and all

4

technical methods necessary of desirable to enable these ends, as well as use by or through the Internet, in any form(s) including, without limitation, as "music on demand", satellite broadcast and pay TV and/or radio.

(c)    The exclusive right to use and publish and allow others to use and publish the name (including professional name(s)), approved likeness, approved photographs and approved biographical material of each person whose performance is embodied in the Master Recordings or who rendered services in connection with the Master Recordings in connection with the exercise of the rights granted to DRT hereunder. Artist agrees to deliver approved likenesses, photographs and biographical materials to DRT promptly following DRT's request for same.

(d)    The right to physical possession and control of the Master Recordings supplied by Artist during the Term and to use and control the use of the said Master Recordings, matrixes, mothers, stampers, or other copies or derivatives and records produced from such Masters during the Term and in the Territory, subject to the terms and conditions of this Agreement.

(e)    The right, subject to the restrictions contained in subparagraph 3(g) below, to combine and couple the Master Recordings with recordings by any third party and to exploit in any manner as aforesaid the Master Recordings together with recordings by any third party.

(f)    The right to refrain from exploiting, or cease exploiting, one or more Master Recording(s) hereunder for any reason. If DRT fails to commercially exploit one or more Master Recordings by the date which is five (5) years following the date on which such Master Recording is Delivered, Artist shall have the right to send written notice of reversion to DRT at any time subsequent to the end of such five (5) year period,, in which case all rights in and to such Master Recording(s) shall revert to Artist on the tenth (10th) day following DRT's receipt of Artist's written notice of reversion.

(g)    Notwithstanding any other provisions of this Agreement, DRT shall not use or authorize the use of any Master Recording(s) hereunder in the United States as follows without Artist's prior written consent, which consent shall not be unreasonably withheld: (i) for coupling; (ii) as premiums; (iii) as a mid-priced record (as such term is commonly understood in the recorded music industry) for at least twelve (12) months following the initial U.S. commercial release of such Master Recording; (iv) as a budget record (as such term is commonly understood in the recorded music industry) for at least eighteen (18) months following the initial U.S. commercial release of such Master Recording; (v) for non-phonorecord uses, including film and television uses and/or advertising uses (excepting advertising for permitted uses of the Masters) or (vi) as a cut-out for at least eighteen (18) months following the initial U.S. commercial release of such Master Recording. Third-party licensing exploitations shall be subject to the provisions of subparagraph 6(d)(ii) below. It is expressly understood and agreed that any withholding of consent resulting from or substantially related to DRT's failure or refusal to provide additional financial or contractual incentives to Artist (such as, by way of illustration and without limitation, DRT's failure or refusal to waive or defer DRT's recoupment rights, DRT's failure or

5

refusal to make financial commitments in excess of those set forth in this Agreement, or DRT's failure or refusal to waive rights granted to DRT in this Agreement) shall be deemed to be unreasonable.

(h)    Artist shall have creative control in determining the creative direction and content of Master Recordings Delivered hereunder. Artist agrees to consult in good faith and in a timely fashion with DRT regarding such creative direction and content, provided that Artist's determination shall be controlling.

4.    (a)    With respect to Master Recordings, Artist shall supply to DRT, free of charge, one or more duplicate ½" mixed-down master tape or digital recordings of each Master Recording. Artist shall also make available to DRT, free of charge, any supporting promotional videos or materials, including advertising materials, whether presently existing or created during the Term of this Agreement (it being expressly understood and agreed that Artist is under no obligation to create any such videos or materials), and DRT shall have the right, subject to the provisions of subparagraph 3(g) above, to use and permit others to use such promotional videos or materials in accordance with the terms and conditions of this Agreement, on a gratis basis, to the same extent that DRT has the right to use the Master Recordings.

(b)    DRT shall obtain Artist's approval of the marketing plans for Albums released hereunder, provided that in the event of a dispute DRT's decision shall be controlling.

(c)    DRT shall consult in good faith with Artist regarding DRT's provision of tour support in connection with Artist's major personal appearance tours in the United States, and personal appearance tours outside the United States. The determination of whether to provide tour support and the specifics of any such tour support, including without limitation the amount, scheduling and recoupability thereof will be mutually agreed on a case-by-case basis, with DRT's decision controlling.

5.    Simultaneously with the delivery of each Master Recording to DRT, Artist will supply to DRT the following (the "Delivery Requirements"):

(a)    The correct title of each Master Recording, all applicable copyright information pertaining to such Master Recordings, including without limitation the names of all authors, composers and publishers thereof, the names of the recording artists and the year and country of first issue of each Master Recording. All such information will be delivered in writing by Artist to DRT at DRT's address set forth above, to the attention of the A&R Administration Department.

(b)    All licenses and necessary or desirable permissions to permit DRT's use of the Master Recordings and promotional materials as contemplated hereunder and written documentation reasonably satisfactory to DRT evidencing that Artist has obtained from the copyright owners, performers, Artist and all other parties all licenses and permissions required

6

for the recording of the compositions contained on the Master Recordings and the exploitation by DRT hereunder of all such Master Recordings.

(c)    All artwork necessary or desirable for use in connection with the promotion, sale and marketing of Records hereunder.

6.    In full consideration for the rights hereby granted, DRT agrees to pay or cause to be paid to Artist the following royalties and advances. All advances are fully recoupable from Royalties (as defined in subparagraph 6(d)(i) below) otherwise payable to Artist hereunder, subject to the provisions of subparagraph 6(d)(ii) below:

(a)    With respect to the First Album, a non-returnable, recoupable advance (the "First Album Advance") of One Hundred Thousand Dollars ($100,000). Such First Album Advance shall be payable Seventy-Five Dollars ($75,000) promptly following full execution of this Agreement, and the balance promptly following delivery of the First Album and associated Delivery Requirements.

(b)    With respect to the Second Album Masters and the Third Album Masters, if DRT exercises DRT's Option(s) therefor, a non-returnable, recoupable advance (the "Second Album Advance" and the "Third Album Advance", respectively) equal to seventy percent (70%) of the lesser of: the royalties earned on Net Sales in the United States of the immediately preceding Album, or the average of the royalties earned on Net Sales in the United States of the immediately preceding two (2) Albums (if there are two (2) such Albums). Such calculation shall be based on the most recent royalty statement rendered to Artist prior to the date of delivery of the applicable Master Recordings (or the last date on which the applicable Master Recordings could have been timely delivered, if earlier), and shall include a good faith estimate of "pipeline" royalties, provided that DRT's reasonable business determination of such "pipeline" royalties shall be controlling. Neither the Second Album Advance, if any, nor the Third Album Advance, if any, shall be less than the minimum amount nor more than the maximum amount set forth below with respect to the applicable Album.

| Album Masters | Minimum Advance | Maximum Advance |
|---|---|---|
| Second | $60,000 | $150,000 |
| Third | $70,000 | $200,000 |

Each such Advance, if applicable, shall be payable Fifty percent (50%) promptly following DRT's exercise of the applicable Option and the balance promptly following Delivery of the applicable Master Recordings.

(d)    (i)    With respect to sales and exploitations of Master Recordings, a royalty (the "Royalty") equal to fifty percent (50%) of DRT's Net Receipts. "Net Receipts" shall be defined as the gross receipts actually received by DRT or credited to DRT from its Distributor

7

and licensees prior to deduction of all distribution fees and other costs charged by Distributor (i.e., no costs shall be deducted from gross receipts prior to computing Net Receipts), minus (i) a combined distribution and overhead services fee equal to the following percentages of gross receipts actually received by Distributor: (A) twenty-six percent (26%) with respect to the First Album and (B) twenty-four percent (24%) with respect to each of the Second Album, if any, and the Third Album, if any; (ii) all direct out-of-pocket costs and expenses paid or incurred by DRT in connection with the Master Recordings, including but not limited to costs of manufacturing (which shall be charged at the aggregate of the actual manufacturing costs charged to DRT by Distributor), mechanical royalties, marketing and promotion costs, shipping, taxes and "price and position" costs (as such term is commonly understood in the industry). Returns, inventory processing, warehousing, and other distribution and sales services shall be deducted from gross receipts in determining "Net Receipts" in accordance with this paragraph 6(d)(i), and the amount to be so deducted shall be handled in accordance with DRT's agreement(s) with Distributor, and charges connected with such services shall, unless otherwise specified in this Agreement, be deducted from gross receipts at the same cost actually charged to DRT by Distributor for purposes of calculating Net Receipts hereunder (i.e., DRT shall not mark up such costs when calculating the amount to be deducted from gross receipts to arrive at Net Receipts).

(ii)  Notwithstanding anything to the contrary contained herein, it is specifically agreed that Royalties accruing to Artist in respect of third-party licensing exploitations (i.e., synchronization licenses, coupling licenses, and similar uses) shall not be applied towards recoupment of the contractual advances provided in subparagraph 6(a) and, if applicable, 6(b). Royalties accruing to Artist in respect of such third-party licensing exploitations shall, however, be applied towards recoupment of any and all discretionary advances made to or on behalf of Artist in connection with the subject matter of this Agreement, including without limitation advances for tour support.

(iii)  DRT agrees to fund the creation of at least one (1) MTV-style music video in connection with each Album released by DRT hereunder, with a minimum budget for each such video of Ten Thousand Dollars ($10,000). DRT shall consult in good faith with Artist as to the track, budget, timing and similar specifics of each such video, provided that DRT's decision shall be controlling.

(iv)  DRT agrees to commit not less than Thirty Five Thousand Dollars ($35,000) towards marketing costs (including promotion and similar expenditures, but not including the Ten Thousand Dollar [$10,000] minimum video budget provided in subparagraph 6(d)(iii) above) in connection with each Album released hereunder. Marketing costs, including amounts in excess of such Thirty-Five Thousand Dollar minimum, shall be expended in accordance with a marketing plan. DRT shall consult in good faith with Artist as to the specifics of such marketing plan, provided that DRT's decision shall be controlling.

(e)  Royalties shall only be payable in respect of Records sold by DRT and for which DRT has received payment or credit. DRT shall hold reserves against anticipated returns and

8

credits hereunder, which reserves shall be equal to twenty-five percent (25%) of the gross shipments in each royalty period. Reserves shall be held for a period of one (1) year, and shall thereafter be liquidated in four (4) equal quarterly installments commencing with the first accounting one (1) year after such reserve was initially established. Notwithstanding anything to the contrary contained herein, if DRT determines at any time in its good faith business judgment, based on proven standard industry practices including, but not limited to, actual pending returns and return requests, anticipated returns based on current market conditions such as store closings and account bankruptcies, current sales vs. shipment information (based on actual SoundScan results) and other reasonable judgments, that its anticipated returns liability exceeds returns then being held, DRT may withhold additional reasonable reserves and adjust payments otherwise due to Artist accordingly.

7.      DRT agrees to obtain and administer all mechanical licenses with respect to Records manufactured and sold hereunder. Artist warrants and represents that mechanical licenses will be available for all compositions embodied on Master Recordings hereunder, on terms no less favorable to DRT than those provided by The Harry Fox Agency, and that DRT shall not be obligated to pay mechanical royalties in excess of the following aggregate amounts with respect to records released in the U.S. and Canada:

>       (i)      For any Album released hereunder, ten (10) times the Statutory Rate;

>       (ii)     For any single released hereunder, two (2) times the Statutory Rate;

>       (iii)    For any EP released hereunder, five (5) times the Statutory Rate;

>       (iv)     For any other record released hereunder, three (3) times the Statutory Rate.

Artist warrants and represents that DRT shall be able to obtain a gratis synchronization licenses for all promotional videos hereunder. Artist further warrants and represents that all "samples" contained in any Master Recording hereunder, if any, shall be cleared by Artist and it is expressly understood and agreed that DRT shall not be obligated to obtain any so-called "sample" licenses. Artist shall advise DRT in writing of all samples contained in Master Recordings hereunder at the time of delivery of such Master Recordings, and shall concurrently furnish DRT with fully-executed copies of all clearances necessary or desirable with respect to such samples. No Master Recording shall be deemed to be delivered hereunder until such clearances have been obtained and furnished to DRT. DRT shall make direct payment of mechanical royalties to all copyright holders, and, subject to the provisions of the following paragraph, the amount of all such payments, as well as the cost of obtaining mechanical licenses, shall be deducted from gross receipts in determining Net Receipts, as provided in subparagraph 6(d) above. If a particular selection is embodied more than once on a particular record, DRT shall pay mechanical royalties in connection therewith at the applicable rate as though the selection were embodied thereon only once.

9

Notwithstanding the foregoing, if the copyright royalties in respect of any record hereunder exceed the applicable amounts set forth above, then, without limitation of DRT's rights, DRT shall have the right to recoup such excess from Royalties (including mechanical royalties) otherwise payable to Artist hereunder.

8.      Payments by DRT to Artist pursuant to this Agreement shall be made and statements issued quarterly within fifteen (15) days following the end of each calendar quarter, and each such payment shall be accompanied by statements setting forth in reasonable detail the computation of the amount thereof.

9.      Artist shall have the right, upon thirty (30) days prior written notice and not more than once per year, to appoint an independent certified public accountant to inspect the books and records of DRT. If so requested by DRT, the appointed accountant shall provide DRT with a written undertaking that it will not disclose any information obtained from such inspection to any third party at any time, other than as may be required by court order, force of law or similar legal requirement. Each such inspection shall be made at Artist's sole cost and expense. Any royalty statements as to which Artist has not specified its objections in writing within a period of two (2) years after the due date of such statement, shall be deemed to have been accepted and approved by Artist. Artist shall commence legal action with respect to any such specified objection, if at all, within three (3) years following the due date of such statement.

10.      DRT shall not be entitled to alter the design of any sleeve supplied by Artist or to institute a new design in replacement thereof without Artist's consent, which consent shall not be unreasonably withheld, other than as specifically provided in this Paragraph 10. "Singles" shall be chosen by Artist, subject to DRT's approval, which approval shall not be unreasonably withheld. DRT shall have the right to add DRT's own logo and that of DRT's Distributor to any and all artwork and/or Records hereunder, whether such artwork is created by Artist or by DRT. Artist agrees to identify and label any and all applicable Master Recordings hereunder which contain "explicit content" in accordance with the standards established by the Recording Industry Association of America under the Parental Advisory Program. If DRT determines, in its sole good faith business discretion, that Master Recordings which Artist has not identified as containing "explicit content" should be so identified, or that additional language is required or desirable to protect legal rights or preclude, minimize or limit liability, DRT shall have the right to affix appropriate logos, language and notices to product derived from the relevant Master Recordings.

11.      (a)  As to each Master Recording, Artist warrants, represents, covenants and agrees that:

(i)      At the time of delivery of each Master Recording to DRT hereunder and during the Term, Artist will be the owner of all right title and interest in and to such Master Recording, including the musical and other performances embodied therein (but excluding the underlying musical composition) and the manufacturing, selling and distribution rights as well as all other rights granted hereunder.

(ii)    That it possesses the full right, power and authority to enter into and to perform this Agreement; that it is under no disability, restriction or prohibition, whether contractual or otherwise, with respect to its right to execute this Agreement, to grant the rights granted hereunder, to perform each and every term and provision hereof; that DRT shall not be obligated to make any payments other than as expressly provided herein in connection with DRT's exercise of the rights granted hereunder; that the Master Recordings delivered hereunder will not infringe any right of any third party; that the Master Recordings are original and that, so long as this Agreement remains in effect, Artist will not grant or attempt to grant to any person, firm or entity rights of any kind which would derogate from or be inconsistent with the rights granted to DRT hereunder.  For purposes of this paragraph, "Master Recordings" shall mean the Master Recordings and all artwork, Delivery Requirements, logos, trademarks, trade names, advertising and promotional materials, videos and any and all other material(s) furnished by or on behalf of Artist to DRT.

(b)  DRT warrants, represents, covenants and agrees that it possesses the full right, power and authority to enter into and to perform this Agreement; that it is under no disability, restriction or prohibition, whether contractual or otherwise, with respect to its right to execute this Agreement and to perform each and every term and provision hereof.

12.    (a)  Artist  will indemnify and hold harmless DRT, its officers, employees, agents, representatives, customers, distributors and sub-licensees (the "Indemnified Parties") of and from any and all actual costs, expenses or damages, including reasonable outside attorneys' fees, incurred in connection with any third party suit, action, proceeding or claim arising from any claim which is inconsistent with the representations, warranties, covenants and/or agreements made by Artist hereunder and reduced to judgment by a court of competent jurisdiction or settled with Artist's consent, which consent shall not be unreasonably withheld.   Artist shall be deemed to have consented to any settlement in an amount not exceeding Seven Thousand Five Hundred Dollars ($7,500).  In the event of any such claim against the Indemnified Parties or any of them, DRT upon written notice to Artist may hold payments due to Artist under this Agreement in an amount consistent with the potential costs to the Indemnified Parties, until the liability upon any such claim has been finally settled determined and paid and the indemnity has been satisfied. Any payments so withheld shall be released and credited to Artist's account hereunder if no suit has been commenced within one (1) year following the date on which such monies were initially withheld or if Artist posts a bond, reasonably satisfactory as to form and amount, guaranteeing payment of amounts which may become due to DRT as a result of such claim.  DRT shall give Artist prompt notice of any such claim, and Artist shall have the right to participate in the defense thereof with counsel of Artist's choice at Artist's sole cost and expense, provided that DRT shall at all times have the right to maintain control of such defense.

(b)  DRT will indemnify and hold harmless Artist, its officers, employees, agents, and representatives (the "Indemnified Parties") of and from any and all actual costs, expenses or damages, including reasonable outside attorneys' fees, incurred in connection with any third

11

party suit, action, proceeding or claim arising from any claim which is inconsistent with the representations, warranties, covenants and/or agreements made by DRT hereunder and reduced to judgment by a court of competent jurisdiction or settled with DRT's consent, which consent shall not be unreasonably withheld.

13.     Artist irrevocably authorizes, empowers and vests in DRT solely during the Term and in the Territory the right but not the obligation to enforce and protect all rights granted hereunder against any infringements or unlawful act committed by third parties. Any legal costs and disbursements incurred by DRT shall be borne between DRT and Artist in a proportion to be mutually agreed between the parties and any sums recovered by way of damages or likewise shall be shared between the parties in the same proportion as the costs were borne. Artist shall have the right to join in any such action with counsel of its choice, provided that such participation shall be at Artist's sole cost and expense (i.e., the cost of such participation shall not be deemed "legal costs" or "disbursements" for purposes of the preceding sentence) and provided further that DRT shall at all times maintain control of such action.

14.     No breach hereunder shall be deemed material until the party alleging such breach shall have given the party alleged to be in breach written notice specifying the alleged breach, and the notified party shall have had a reasonable time (a "reasonable time" shall not exceed thirty days if such breach is capable of being cured within such period; if the alleged breach is not reasonably capable of cure within such period, the party alleged to be in breach shall commence curing within such thirty (30) day period and shall continue with all possible alacrity to complete such cure as expeditiously as possible) to cure such alleged breach. It is expressly understood and agreed that this Paragraph 14 shall not operate to extend any specific time periods which are set forth in this Agreement.

15.     DRT shall be entitled to deal with and in Master Recordings and license and assign the rights acquired or granted to DRT under this Agreement solely in the course of exploiting Master Recordings in its absolute discretion (subject to the terms and conditions of this Agreement), provided always that DRT shall not be entitled to assign the entire benefit of this Agreement without the prior written consent of Artist which shall not be unreasonably withheld, save to a parent, associated, subsidiary or affiliated Artist of DRT or to any person, firm or corporation which shall own or control or shall acquire all or a substantial part of DRT's business or assets. Artist understands and agrees that DRT may produce, sell, distribute and otherwise exploit Records of any kind, whether or not competitive with those licensed hereunder, including those produced by itself or others. Artist shall not be entitled to assign this Agreement, and any such purported assignment shall be void ab initio, save that Artist shall be entitled to assign Artist's income stream hereunder. In the event of any such assignment by Artist, Artist shall cooperate with DRT in furnishing all documentation necessary or desirable in connection with such assignment.

16.     This Agreement shall be governed by and construed in accordance with and governed by the laws of the State of New York, without regard to choice of laws provisions. DRT and Artist

12

agree that any action relating to, connected with or arising out of this Agreement shall be brought in the state or federal courts located in New York county, and the parties to this Agreement hereby submit to the jurisdiction and venue of such courts.

17.    The provisions set forth herein constitute the entire agreement of the parties. This Agreement shall not be modified, altered or changed except by an instrument signed by a duly authorized representative of each of the parties. No waiver of any term or condition of this Agreement shall be deemed a waiver of any other terms or conditions of this Agreement. DRT makes no representations regarding the number of Records to be sold hereunder, it being understood by both parties that Record sales are totally speculative.


**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**


13

18.    All notices, consents, requests, demands and other communications hereunder shall be given to or made upon the respective parties hereto at their respective addresses specified below or, as to any party, at such other address as may be designated by it in a written notice to the other party. All notices, requests, consents and demands hereunder shall be effective when personally delivered to duly deposited in the United States mails, certified or registered, postage prepaid, or delivered via facsimile. A copy of all notices to DRT shall be sent to Holly T. Browde, Esq., 9953 Westwanda Dr., Beverly Hills, CA 90210. A copy of all notices to Artist shall be sent to Greenberg, Traurig, LLP, 200 Park Avenue, 16th Floor, New York, N.Y. 191166, Attention: Andrew G. Tavel, Esq.

DRT ENTERTAINMENT, INC., a New York corporation

By: _____
Name: Ted Green
Title: Co-President

NEIL FALLON
Social Security Number: 216 06 0646
Date of Birth: 10/25/1

BRAD PAUL GASTER
Social Security Number: 212 13 4547
Date of Birth: 2/19/71

DAN MAINES
Social Security Number: 215 98 6529
Date of Birth: 3-16-71

RICHARD SULT
Social Security Number: 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
Date of Birth: 3-26-70

14